1

2

3

4

5

6

7

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

8   STATE OF WASHINGTON,                         NO.

9                          Plaintiff,            **COMPLAINT FOR DECLARATORY**
                                                 **AND INJUNCTIVE RELIEF**
10          v.

11   UNITED STATES DEPARTMENT OF
     HOMELAND SECURITY;
12   IMMIGRATION AND CUSTOMS
     ENFORCEMENT; CHAD F. WOLF, in
13   his official capacity as Acting Secretary
     of the U.S. Department of Homeland
14   Security; and MATTHEW ALBENCE,
     in his official capacity as Acting
15   Director of U.S. Customs and
     Immigration Enforcement,
16
                           Defendants.
17

18

19

20

21

22

23

24

25

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

# I.     INTRODUCTION

1.      On July 6, 2020, the federal Defendants abruptly and without any legal basis promulgated a cruel, arbitrary, and capricious rule that will bar hundreds of thousands of international students from the United States this fall in the midst of their undergraduate and graduate studies (the "July 6 Directive").[1] These students' visas will be promptly revoked if their schools continue with remote learning, forcing them to immediately leave the State of Washington and return to their home countries in the midst of the COVID-19 pandemic to avoid detention and deportation. For schools that will offer "hybrid" or on-campus instruction, international students currently living abroad and attending classes remotely must return to the United States to attend classes in person, regardless of any health conditions that put them at higher risk from the virus. The directive recklessly jeopardizes the health and safety of all university communities and surrounding areas in the State of Washington, and could also result in this State's loss of valuable COVID-19 vaccine and virus researchers, many of whom are F-1 visa holders. Defendants promulgated this illogical and illegal new directive in an apparent attempt to enforce President Trump's July 6 tweet that "SCHOOLS MUST OPEN IN THE FALL!!!"[2]

2.      The July 6 Directive issued by Immigration and Customs Enforcement (ICE) requires all students on F-1 and M-1 visas whose university curricula are entirely online to depart the country, and bars any such students currently outside the United States from entering or reentering the United States. The July 6 Directive likewise requires all students on F-1 and M-1 visas whose university or college is adopting an in-person or "hybrid" approach (i.e., limited in-person and largely online classes) to return to the United States irrespective of whether it is safe or feasible for them to do so and regardless of whether they have underlying health conditions

---

[1] U.S. Immigration and Customs Enforcement, *Broadcast Message: COVID-19 and Fall 2020*, July 6, 2020, https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf (last visited July 10, 2020).
[2] Donald Trump (@realDonaldTrump), Twitter (July 6, 2020, 11:40 AM PST), https://twitter.com/realDonaldTrump/status/1280209946085339136 (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

placing them at greater risk for severe illness or death from COVID-19. The July 6 Directive also requires every institution of higher education to decide, by Wednesday July 15, 2020—nine days after its issuance—whether it would fully or partly resume in-person education, and to submit an "operational change plan" if classes would be online-only. Schools adopting a "hybrid" system of online and in-person instruction must, by August 4, 2020, certify for each and every F-1 and M-1 visa student that the student is not taking an entirely online course load for fall 2020, and that the student is taking "the minimum number of online classes required to make normal progress in their degree program." The July 6 Directive further warns that "[i]f a school changes its operational stance mid-semester, and as a result a nonimmigrant student switches to only online classes," these students "must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction." Finally, the July 6 Directive states that the "procedures and responsibilities" therein will be published "in the near future as a Temporary Final Rule in the Federal Register." But the Directive itself establishes "procedures and responsibilities" with which schools and students "must" comply as early as July 15, 2020.

3.      The July 6 Directive has thrown educational institutions' planning for fall 2020— which relied on the March 13 Exemption—into chaos. Defendants have given these institutions an impossible choice: lose numerous F-1 and M-1 visa students who bring immense educational and financial benefits to the school, or take steps to retain those students through in-person classes, even where those steps contradict each school's judgment about how best to protect the health of the students, faculty, staff, and university communities as a whole. Schools must now either move forward with their carefully calibrated, thoughtful, and difficult decisions to proceed with their curricula fully or largely online in the fall of 2020—which, under ICE's new July 6 Directive, would undermine the education, safety, and future prospects of their international students and their campus community—or attempt, with just weeks before classes resume, to provide and/or increase in-person education despite the grave risk to public health and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

safety that such a change might entail, and commit to retaining in-person education throughout the academic year even amidst skyrocketing infection rates. And they must make this choice by the arbitrarily early deadline of Wednesday, July 15, 2020, with only nine days' notice, amidst the ongoing and unpredictable COVID-19 pandemic.

4.       ICE's July 6 Directive is an effort by the federal government to force universities to reopen in-person classes, which would require housing students in densely packed residential halls, notwithstanding the judgment of many colleges and universities that it is neither safe nor educationally advisable to do so, and to force such a reopening when neither the students nor the universities have sufficient time to react to or address the additional risks to the health and safety of their communities. As Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli stated on July 7, 2020, the July 6 Directive "will . . . encourage schools to reopen."[3]

5.       This rush to reopen ignores that the harsh reality that the COVID-19 pandemic is still ongoing and that the State, its local heath districts, and its universities and colleges need nimbleness as opposed to ham-fisted edicts. On March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic. By that time, Washington Governor Jay Inslee had already declared a state of emergency in Washington, which was an early epicenter of the outbreak in the United States. COVID-19 has forced governments, businesses, and organizations at all levels of society to implement unprecedented protocols to slow the transmission of the virus and mitigate the still-rising death toll from the novel coronavirus.

6.       All Washington institutions of higher education have conducted classes remotely since the onset of the pandemic, and have been working to develop plans for the 2020–2021 academic year that carefully balance the health and safety of faculty, students, and staff with the institutions' core mission of educating students. The ability to provide remote education during the pandemic is of paramount importance to Washington institutions. COVID-19 is a highly

---

[3] John Bowden, Cuccinelli says rule forcing international students to return home will 'encourage schools to reopen', The Hill (July 7, 2020), https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

contagious disease that spreads from human to human in close contact situations. Medical evidence and official governmental guidance indicate that indoor gatherings of any size are of particular concern. Densely populated classrooms that are attended with on-campus instruction have the potential to turn into "super-spreader" situations that endanger the health of not only the college or university community, but also those in the surrounding areas and anyone else with whom community members may come into contact.

7.      Until recently, ICE, a division of the U.S. Department of Homeland Security (DHS), recognized educational institutions' need to educate students remotely to protect public safety during the COVID-19 pandemic, and accordingly issued an exemption from preexisting requirements that holders of certain nonimmigrant student visas (F-1 and M-1 visas) must attend most classes in person to maintain their visa status. On March 13, 2020, ICE issued guidance indicating that F-1 and M-1 visa holders could attend classes remotely, and that this exemption would be "in effect for the duration of the emergency" (the "March 13 Exemption"). But on July 6, 2020, ICE abruptly, and without warning, reversed course and announced that it was rescinding the March 13 Exemption.

8.      ICE's July 6 Directive, and any "temporary final rule" that follows therefrom, are arbitrary and capricious agency actions in violation of the Administrative Procedure Act (APA). The July 6 Directive gives no indication that ICE even considered (i) the health of students, faculty, university staff, or communities in formulating the new directive and the need for schools to have flexibility in responding to the public health crisis; (ii) the reliance of both students and universities on ICE's statements that the preexisting exemptions would be "in effect for the duration of the emergency" posed by the COVID-19 pandemic, which continues to this day; (iii) the absence of other options for universities to provide their curricula to many of their international students; or (iv) the broad and widespread effect the July 6 Directive would have on hundreds of thousands of students and their families, including the expensive and in some cases impossible task of moving countries in the midst of a global pandemic. Certainly, no

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  notice-and-comment period was provided. Accordingly, this unlawful, arbitrary, and procedurally

2  defective agency action must be enjoined and set aside.

3  ## II.    JURISDICTION AND VENUE

4  9.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (action arising under the

5  laws of the United States), 28 U.S.C. § 1346 (United States as a defendant), and 5 U.S.C. §§ 701–

6  706 (judicial review of agency action under the Administrative Procedure Act (APA)). An actual

7  controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court

8  may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201–

9  2202 and 5 U.S.C. §§ 705–706.

10  10.    Defendants' issuance of the July 6 Directive constitutes a final agency action

11  because it is a definitive statement of the agency's position, has a direct and immediate effect on

12  the State and its institutions of higher education, purports to have the status of law, imposes

13  mandatory requirements, and requires immediate compliance by July 15, 2020. It is, therefore,

14  judicially reviewable under the APA. 5 U.S.C. §§ 704, 706.

15  11.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(c) because Plaintiff

16  the State of Washington is located here, this action seeks relief against federal agencies and their

17  officials acting in their official capacities, and a substantial part of the events or omissions giving

18  rise to these claims occurred or will imminently occur here. In particular, implementation or

19  enforcement of the July 6 Directive or any "temporary final rule" that follows therefrom will have

20  an adverse impact on the State as a whole and institutions of higher education throughout the

21  State, including the University of Washington in Seattle.

22  ## III.    PARTIES

23  12.    Plaintiff the State of Washington is a sovereign state represented herein by its

24  Attorney General, who is the State's chief legal adviser. The powers and duties of the Attorney

25  General include acting in federal court on matters of public concern to the State.

26

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

5

13.     The State of Washington brings this action to redress harms to its sovereign and quasi-sovereign interests, proprietary interests, and interests as *parens patriae*.

14.     The State of Washington has a sovereign and quasi-sovereign interest in protecting the health, safety, and well-being of its residents. Washington's response to the COVID-19 pandemic, including its implementation of social-distancing and other health and safety requirements, is an exercise of its police power. The July 6 Directive and any "temporary final rule" that follows therefrom infringe on Washington's exercise of its police powers by forcing State institutions of higher education to decide, within 9 days of the Directive's issuance, whether to fully or partly resume in-person instruction in fall 2020, leaving them unable to adequately account for safety considerations and respond to changing circumstances amidst a rapidly evolving and largely unpredictable pandemic.

15.     The State of Washington, through its public institutions, including those of higher education, is directly subject to the July 6 Directive and will suffer direct proprietary harm as a result. Washington has six public baccalaureate colleges and universities: the University of Washington, Washington State University, Central Washington University, Eastern Washington University, Western Washington University, and The Evergreen State College. Washington also has a system of 30 public community and technical college districts comprised of 34 separate colleges, whose funding is coordinated by the Washington State Board for Community and Technical Colleges. They are generally governed by the Community and Technical College Act of 1991, Chapter 28B.50 Wash. Rev. Code. In addition, Washington is home to a number of independent, private schools and colleges and a variety of other higher education institutions. Each of these institutions is subject to the July 6 Directive and stands to suffer harm to its educational mission and financial health.

16.     In addition, the State of Washington has a general proprietary interest in welcoming international students to the State to obtain higher-education degrees and education from Washington public and private institutions. International students make valuable

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

contributions to their local communities and the State economy while they reside here. Many graduates of Washington public and private institutions go on to build their lives and careers here, where they contribute to the State economy as employers, workers, consumers, and taxpayers.

17.    Defendant United States Department of Homeland Security (DHS) is a federal agency of the United States.

18.    Defendant Immigration and Customs Enforcement (ICE) is a division of the United States Department of Homeland Security. The July 6 Directive was issued by the Student and Exchange Visitor Program (SEVP), a division of ICE.

19.    Defendant Chad F. Wolf is the Acting Secretary of the United States Department of Homeland Security. He is sued in his official capacity.

20.    Defendant Matthew Albence is the Acting Director of U.S. Immigration and Customs Enforcement. He is sued in his official capacity.

### IV.    FACTS

**A.    The COVID-19 Pandemic**

21.    The State of Washington is currently in the midst of the COVID-19 pandemic, a global health crisis caused by a novel coronavirus. A novel coronavirus is a new coronavirus that has not been previously identified.[4]

22.    The numbers of confirmed cases and deaths from COVID-19 have grown exponentially in the United States since January 2020, and are expected to continue to grow exponentially over the coming months. All human beings share a risk of contracting and, upon contraction, transmitting the virus that causes COVID-19. Any adult who contracts the virus may experience life-threatening symptoms, lifelong health consequences, and death.

23.    On January 30, 2020, the World Health Organization (WHO) declared the novel coronavirus outbreak a Public Health Emergency of International Concern. On February 11, 2020,

---

[4] State of Washington Office of the Governor, Proclamation by the Governor 20-05, https://www.Governor.wa.gov/sites/default/files/proclamations/20-05%20Coronavirus%20%28final%29.pdf (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    it announced an official name for the disease causing the 2019 outbreak, coronavirus disease

2    2019, abbreviated as COVID-19. (In COVID-19, 'CO' stands for 'corona,' 'VI' for 'virus,' and

3    'D' for 'disease.' Formerly, this disease was referred to as "2019 novel coronavirus" or

4    "2019-nCoV.").[5]

5         24.    The virus that causes COVID-19 is easily transmitted. It is thought to spread

6    mainly from person to person. It is spreading very easily and sustainably between people.

7    Information from the ongoing COVID-19 pandemic indicates this virus spreads more efficiently

8    than influenza.[6] The fatality rate of COVID-19 is higher than the fatality rate for the seasonal

9    influenza.

10        25.    On January 21, 2020, the Washington State Department of Health confirmed what

11   was believed to be the first case of COVID-19 in the United States in Snohomish County,

12   Washington. The Centers for Disease Control and Prevention (CDC) then confirmed as the first-

13   known U.S. case a diagnosis of a 35-year-old man living in Snohomish County, Washington.[7]

14   The State of Washington made the first announcement of a death from the disease in the U.S. on

15   February 29, 2020 and later announced that the two deaths on February 26, 2020 were also due

16   to COVID-19.

17        26.    On February 29, 2020, Washington Governor Jay Inslee declared a state of

18   emergency in all counties in Washington. In Proclamation 20-05, Governor Inslee stated that the

19   CDC had identified the potential public health threat posed by COVID-19 both globally and in

20   the United States as "high." Governor Inslee found that the Washington State Department of

---

[5] The World Health Organization, *WHO Director-General's statement on IHR Emergency Committee on Novel Coronavirus (2019-nCoV)* (January 30, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-statement-on-ihr-emergency-committee-on-novel-coronavirus-(2019ncov) (last visited July 10, 2020).

[6] The Centers for Disease Control, *How Covid Spreads* (updated on June 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited July 10, 2020).

[7] It was later determined that a woman in California died on February 6 from COVID-19, meaning she likely contracted it in early to mid-January. CNN, Jason Hanna, et al., *2 Californians died of coronavirus weeks before previously known 1st US death* (Apr. 22, 2020), https://www.cnn.com/2020/04/22/us/california-deaths-earliest-in-us/index.html (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

8

Health had confirmed localized person-to-person spread of COVID-19 in Washington State, which "significantly increase[ed] the risk of exposure and infection to Washington State's general public and creat[ed] an extreme public health risk that may spread quickly[.]"[8]

27.      On March 12, 2020, Governor Inslee announced closures for all public and private K-12 schools in King, Snohomish, and Pierce Counties beginning from March 17 through at least April 24.[9] Later, on March 13, Governor Inslee announced K-12 closures until at least April 24 throughout the state.[10] On April 6, 2020, Governor Inslee announced that the school closure would encompass the rest of the school year statewide.[11]

28.      The two largest state universities, University of Washington (UW) and Washington State University (WSU) curtailed on-campus classes during the pandemic. UW announced its closure on March 6; and on March 11, WSU announced the closure would begin after its spring break, on March 23. All Washington institutions of higher education swiftly implemented remote operations for the remainder of spring 2020.

29.      On March 13, 2020, President Donald J. Trump declared a national emergency in response to the COVID-19 pandemic.[12]

30.      New information regarding the novel coronavirus that causes COVID-19 is released daily by public health authorities, including national and international authorities and the

---

[8] State of Washington Office of the Governor, Proclamation by the Governor 20-05, https://www.Governor.wa.gov/sites/default/files/proclamations/20-05%20Coronavirus%20%28final%29.pdf (last visited July 10, 2020).

[9] State of Washington Office of the Governor, Proclamation by the Governor 20-08, https://www.governor.wa.gov/sites/default/files/proclamations/20-08%20Coronavirus%20%28tmp%29.pdf (last visited July 10, 2020).

[10] State of Washington Office of the Governor, Proclamation by the Governor 20-09, https://www.governor.wa.gov/sites/default/files/proclamations/20-09%20Coronavirus%20Schools%20Amendment%20%28tmp%29.pdf (last visited July 10, 2020).

[11] State of Washington Office of the Governor, Proclamation by the Governor 20-09.1, https://www.governor.wa.gov/sites/default/files/proclamations/20-09.1%20-%20COVID-19%20School%20Closure%20Extension%20%28tmp%29.pdf (last visited July 10, 2020).

[12] Proclamation on Declaring National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (March 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF                    9                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  Washington State Department of Health. People who experience serious cases of COVID-19 and

2  do not die face the prospect of prolonged recovery, including the need for extensive rehabilitation

3  for profound reconditioning, loss of digits, permanent neurologic damage, and the irreversible

4  loss of respiratory capacity.

5          31.     People can also carry and spread the novel coronavirus but be asymptomatic or

6  pre-symptomatic, making testing or seclusion of only those who are symptomatic an ineffective

7  solution.[13]

8          32.     There is no vaccine against COVID-19, nor is there any known medication to

9  prevent infection. The most effective measures to reduce the risk are to attempt to prevent

10 vulnerable populations from being infected in the first place, and to limit community spread.

11 Physical distancing, or remaining physically separated from known or potentially infected

12 individuals, and vigilant sanitation and hygiene, are the most effective measures for protecting

13 people from contracting the novel coronavirus.

14         33.     Evidence indicates that the most likely means of transmission of the coronavirus

15 that causes COVID-19 is through close human-to-human contact, especially indoors. This

16 presents a particular risk for university campuses. Crowded classrooms, dining facilities, and

17 dormitories are commonplace features of ordinary campus life and could lead to large-scale

18 outbreaks of COVID-19 until the pandemic subsides.

19         34.     As of July 10, 2020, over 3.1 million individuals have become infected in the

20 United States, and nearly 133,000 have died.[14] The University of Washington's Institute for

21 Health Metrics and Evaluation recently projected that between 157,216 to 244,540 people in the

22 United State could die by November 1, 2020.[15]

---

23 [13] The Centers for Disease Control, *How Covid Spreads* (updated on June 16, 2020),
24 https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited July 10, 2020).
    [14] *Coronavirus Disease 2019 (COVID-19),* Centers for Disease Control and Prevention,
25 https://tinyurl.com/CDCcovidcases (last visited July 10, 2020).
    [15] Institute for Health Metrics and Evaluation at the University of Washington, COVID-19 Projections,
26 https://tinyurl.com/IHMEprojections (last updated July 7, 2020).

35.     Efforts to contain the spread of this highly contagious disease have included broad shutdowns of society. On March 16, 2020, the CDC and members of the national Coronavirus Task Force issued guidance advising individuals to adopt far-reaching physical distancing measures, such as working from home, avoiding shopping trips and gatherings of more than 10 people, and staying away from bars, restaurants, and food courts.

36.     Washington has continually taken steps to protect the health and safety of its residents from human-to-human and surface-to-human spread of COVID-19. Washington Governor Jay Inslee has issued a number of executive orders suspending or severely curtailing operations of non-essential businesses, schools, and other locations where individuals congregate, and putting other social-distancing measures in place. Governor Inslee has revisited, amended, and revised many of these orders in response to changing circumstances and the best available data and evidence as the situation has evolved.

37.     Notwithstanding these mitigation measures, COVID-19 cases continue to rise nationwide. As of the filing of this complaint, the number of new confirmed cases in Washington is at an all-time high. Since the onset of the pandemic, there have been over 38,000 confirmed cases in Washington, over 4,600 hospitalizations, and over 1,400 deaths (a death rate of 3.7%).[16] Washington's current guidance provides that it is safest for all Washington residents to stay home as much as possible and maintain social distancing in public, and reflects a particular concern with indoor gatherings. Moreover, states that have relaxed physical distancing measures, including by allowing indoor gatherings and the opening of locations where individuals congregate—such as Texas, Arizona, and Florida—are now seeing renewed surges and record-setting numbers of COVID-19 cases, hospitalizations, and deaths.

---

[16] Washington Department of Health, COVID-19 Data Dashboard, https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard (last updated July 8, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**B.      ICE's Initial Response to the Pandemic**

38.      International students may attend American universities on nonimmigrant F-1 or M-1 visas. The F-1 visa is designed for students who will be attending an academic program or full-time degree program at a university, school, or college which is approved by U.S. Immigration and Customs Enforcement. F-1 visas can also be obtained in some circumstances for secondary school and K-12 private school. The M-1 visa is used for vocational and nonacademic courses of studies.

39.      Eligibility to maintain F-1 or M-1 status is governed by 8 C.F.R. § 214.2.

40.      Students on F-1 or M-1 visas must pursue a "full course of study" during their stay in the United States. 8 C.F.R. §§ 214.2(f)(5)(i); (m)(3).

41.      These regulations define the extent to which online courses may count toward the full course of study requirement. 8 C.F.R. § 214.2(f)(6)(i)(G) provides: "For F-1 students enrolled in classes for credit or classroom hours, no more than the equivalent of one class or three credits per session, term, semester, trimester, or quarter may be counted toward the full course of study requirement if the class is taken on-line or through distance education and does not require the student's physical attendance for classes, examination or other purposes integral to completion of the class. An on-line or distance education course is a course that is offered principally through the use of television, audio, or computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing. If the F-1 student's course of study is in a language study program, no on-line or distance education classes may be considered to count toward a student's full course of study requirement."

42.      For M-1 students, 8 C.F.R. § 214.2(m)(9)(v) provides: "No on-line or distance education classes may be considered to count toward an M–1 student's full course of study requirement if such classes do not require the student's physical attendance for classes, examination or other purposes integral to completion of the class. An on-line or distance education course is a course that is offered principally through the use of television, audio, or

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

computer transmission including open broadcast, closed circuit, cable, microwave, or satellite, audio conferencing, or computer conferencing."

43.    On March 13, 2020, SEVP, in recognition of the extraordinary circumstances posed by the COVID-19 pandemic and in response to "inquiries concerning the proper status" of international students in the United States on academic visas "who may have [to] face slightly different scenarios related to emergency procedures implemented by SEVP-certified learning institutions," issued guidance concerning F-1 students' ability to maintain their visa status (the "March 13 Exemption").[17]

44.    As relevant here, the March 13 Exemption addressed students attending a school that "temporarily stops in-person classes but implements online or alternate learning procedures." The March 13 Exemption directed students to "participate in online or other alternate learning procedures and remain in active status" with SEVP. Accordingly, students could participate in remote learning implemented as a result of the pandemic—either in the United States or abroad—while retaining their visa status.

45.    The March 13 Exemption indicated that it was a "temporary provision" that would remain **"in effect for the duration of the emergency."** (Emphasis added). SEVP also noted that the situation was "fluid" and "difficult" and that "SEVP will continue to monitor the COVID-19 situation and will adjust its guidance *as needed*." (Emphasis added).

46.    The President's national emergency declaration has not been rescinded or terminated. An emergency in fact continues to persist, as daily COVID-19 cases in the United States have never significantly decreased and have recently begun spiking in several regions, including in the State of Washington.

47.    Notwithstanding the March 13 Exemption's statement that it would remain "in effect for the duration of the emergency," on June 4, 2020, SEVP issued a "Frequently Asked

---

[17] U.S. Customs and Border Protection, *COVID-19: Guidance for SEVP Stakeholders*, March 13, 2020, https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

13

Questions" document asserting that "SEVP has not issued guidance to international students and schools for the fall semester."[18]

**C.      Without Warning, ICE Announces That It Will End the COVID-19 Exemptions**

48.      On July 6, 2020, without employing notice and comment rulemaking, or even giving students or universities any indication that it was considering revising its policy, SEVP issued a document (the "July 6 Directive"), attached as **Exhibit 1**,[19] which an accompanying "News Release" described as announcing "modifications . . . to temporary exemptions for nonimmigrant students taking online classes due to the pandemic for the fall 2020 semester."[20]

49.      The July 6 Directive provided that: "nonimmigrant F or M students "attending schools operating entirely online may ***not*** take a full online course load and remain in the United States. The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States." (Emphasis in original).

50.      Moreover, the July 6 Directive ordered that "[a]ctive students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status. If not, they may face immigration consequences including, but not limited to, the initiation of removal proceedings."

51.      The July 6 Directive indicated that the "U.S. Department of Homeland Security plans to publish the procedures and responsibilities . . . in the near future as a Temporary Final Rule in the Federal Register." As of the filing of this Complaint, no procedures or responsibilities have been published in the Federal Register.

---

[18] U.S. Customs and Border Protection, *COVID-19: Guidance for SEVP Stakeholders*, updated June 4, 2020, https://web.archive.org/web/20200605003435/https://www.ice.gov/doclib/coronavirus/covid19faq.pdf (last visited July 10, 2020).

[19] U.S. Immigration and Customs Enforcement, *Broadcast Message: COVID-19 and Fall 2020*, July 6, 2020, https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf (last visited July 10, 2020).

[20] U.S. Customs and Border Protection, SEVP modifies temporary exemptions for nonimmigrant students taking online courses during fall 2020 semester, July 6, 2020, https://www.ice.gov/news/releases/sevp-modifies-temporary-exemptions-nonimmigrant-students-taking-online-courses-during (last visited July 10, 2020).

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

14

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

52. The July 6 Directive further directed that "[s]chools that offer **entirely online classes or programs** or **will not reopen** for the fall 2020 semester **must** complete an operational change plan and submit it to" SEVP "no later than Wednesday, July 15, 2020." (Emphasis in original).

53. Moreover, the July 6 Directive stated "[s]tudents attending schools offering a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online," provided that for each such student, the school "certif[ies] to SEVP, through the Form I-20, 'Certificate of Eligibility for Nonimmigrant Student Status,' that the program is not entirely online, that the student is not taking an entirely online course load this semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." Compliance with this requirement would require the institution to issue a new Form I-20 for each of its potentially thousands of students on F-1 visas and to do so within 21 business days of the July 6 Directive. Doing so is not only unduly burdensome, but, in many cases, impossible because students are generally not required to register for particular classes until closer to the start of the semester.

54. The July 6 Directive further warns that "[i]f a school changes its operational stance mid-semester"—for instance, in response to a dangerous, local surge of COVID-19 cases—"and as a result a nonimmigrant student switches to only online classes," these students "must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction."

55. Neither the July 6 Directive nor its accompanying "News Release" or updated "Frequently Asked Questions"[21] document indicates any consideration of the multitude of factors relevant and important to ICE's decision to force students holding F-1 or M-1 visas to attend classes in person as a condition of maintaining their visa status—including when their school has

---

[21] U.S. Immigration and Customs Enforcement, *Frequently Asked Questions for SEVP Stakeholders about Guidance for the Fall 2020 Semester*, https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf (last updated July 7, 2020).

decided to provide classes online only in order to safeguard the health of students, faculty, staff, and the surrounding community.

56.     ICE's Directive reveals no consideration of its action's impact on the health of students, faculty, staff, or the surrounding communities.

57.     Further, ICE's Directive does not account for the reality that the COVID-19 pandemic continues to this day, and that record daily numbers of infections are being reported in the United States.

58.     ICE's action also did not account for the reliance of both students and educational institutions on ICE's statements in the March 13 Exemption that the exemptions it announced were due to the COVID-19 pandemic and would be "in effect for the duration of the emergency."

59.     In fact, the July 6 Directive describes the exemptions given in the March 13 Exemption as allowances made "during the height of the Coronavirus Disease (COVID-19) crisis"—entirely disregarding the fact that the present rate of documented cases of infection across the country exceeds those of mid-March by a considerable amount. And that rate continues to climb, including in Washington.

60.     The agency also did not consider the absence of other options by which universities and other educational institutions affected by the COVID-19 pandemic and concerned for their students' health and welfare (particularly those students who have underlying health conditions placing them at greater risk for a potentially deadly response to a COVID-19 infection) might provide their curricula to F-1 and M-1 students.

**D.     The July 6 Directive's Impact on Washington, Its Educational Institutions, and Their Students**

61.     According to the Institute of International Education, Washington ranks 11th in the nation for the number of international students who study here. For the 2018–2019 academic year (the most recent year for which data is available), there were 27,472 international students

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  in the State. The estimated international student expenditure in the State for that year approached

2  a billion dollars ($956,133,414).[22]

3      62.     Every public institution of higher education in Washington, and the vast majority

4  of private institutions, serve international students. In 2018–2019, the University of Washington

5  alone had 9,311 international students.[23] Additionally, Washington's community and technical

6  colleges collectively served approximately 13,000 F-1 and M-1 students in the 2018–2019

7  academic year. Several community colleges in Washington, such as Green River Community

8  College, Shoreline Community College, and the Seattle Colleges, serve especially large numbers

9  of international students, and rely heavily on their tuition payments for financial viability.

10 Washington also contains multiple K-12 schools that host F-1 students.

11     63.     The July 6 Directive will harm continuing F-1 and M-1 students immensely. For

12 many students affected by the July 6 Directive, it is infeasible or impossible to attempt to transfer

13 to a program that offers in-person curriculum and therefore allows them to pursue their education

14 from within the United States on F-1 or M-1 visa status. These students will, therefore, likely be

15 forced to leave the country. The consequences of this sudden displacement are both financial and

16 personal. In addition to incurring substantial expenses to make international travel arrangements

17 in the midst of a pandemic that has significantly reduced the availability of air travel, as well as

18 losing their homes—in many instances at great cost associated with broken leases—some students

19 will be forced to upend their young children's lives by returning to their home countries, while

20 others' families will be split apart in order to comply with the July 6 Directive.

21     64.     Moreover, for many F-1 or M-1 students in Washington, organizing travel to their

22 home countries is currently either prohibitively expensive or practically impossible. For some

23 countries, such as India or Colombia, there are no commercial flights allowed until the end of

24 August at the earliest. Students from Burundi, Madagascar, or Jordan cannot currently book

25     _____

[22] Open Doors: Report on International Educational Exchange, 2019 Fact Sheet: Washington,

26 https://tinyurl.com/yc58e8b6 (last visited July 10, 2010).

[23] Id.

flights home because air travel to these countries is indefinitely suspended. Finally, many of Washington's Chinese students report prohibitively expensive price tags of $10,000-$30,000 for flights to China with multiple stops, further jeopardizing their health should they make the trip back home. The enormous cost of moving back during a pandemic, having already spent a large amount of money to move to the United States for their studies, makes it more unlikely these students would be able or willing to move back to Washington to continue their studies should in-person classes resume.

65.     For continuing F-1 students enrolled in a hybrid program who are currently outside of the United States, if the students cannot return to the United States either because of travel restrictions or an inability to get an F-1 entry visa because of the suspension of consular processing of visa applications—all of which were instituted in response to the COVID-19 emergency and remain in effect to this day—these students will lose their F-1 status by the terms of the July 6 Directive. In turn, these students would lose their ability to pursue pre-completion internship and experiential learning opportunities, as well as their eligibility for work allowances in summer and fall of 2021, because of the requirement that students maintain F-1 status for the full academic year preceding their access to practical training. *See* 8 C.F.R. § 214.2(f)(10).

66.     Some institutions, such as Yakima Valley College, have already made the determination they cannot safely hold in person instruction, and have announced they will be going fully online for Fall 2020. For F-1 students enrolled in these programs, or for students who are unable to secure a spot in the limited in-person classes being offered by institutions adopting the hybrid approach, those students cannot lawfully remain in the United States to continue their studies under the July 6 Directive. The same is true for F-1 students attending hybrid or in-person universities, if those institutions later have to switch course and adopt a fully online approach in response to a local surge rendering continued in-person classes unsafe. Unless this Court intervenes, these students will be required to make precipitous arrangements to return to their home countries amid a worldwide pandemic that has caused nations to close their borders and

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

18

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

considerably limited international travel options. They must abandon housing arrangements they have made, breach leases, pay exorbitant airfares, and risk COVID-19 infection on trans-oceanic flights. And if their departure is not timely they risk detention by immigration authorities and formal removal from the country that may bar their return to the United States for ten years. 8 U.S.C. § 1182 (a)(9).

67.    While some students could theoretically participate in a fully online program from outside the United States, they may have their research and learning inhibited by time zone variations, unavailable, unreliable, or state-managed Internet connections, and other barriers to online learning. Still other students simply cannot participate in online learning in their home countries. For instance, some of Washington's F-1 students are from countries that may lack resources such as libraries or internet access, such as Nepal, Burundi, or Madagascar, where only approximately 5% of students have access to the internet.

68.    The value of the education offered by Washington's institutions of higher education hinges on the diversity of perspective offered by these international students. Rendering their participation impossible or insignificant will impair the educational experience for all students. Moreover, the University of Washington, the State's flagship research institution, depends on F-1 graduate students for teaching support in its undergraduate programs. Requiring these students to provide instruction from remote locations in their home countries, potentially with considerable time-zone disparities and variable Internet connectivity, will make it harder for faculty to coordinate with their student teaching aides and obtain the full benefit of their pedagogy.

69.    The July 6 Directive will also make continued study at Washington institutions impracticable for many F-1 visa students. The loss of the ability to perform research or fieldwork, or even participate in basic coursework under reasonable conditions, will force many students to interrupt their studies. Many students risk losing their ability to access work allowances because of the requirement that students maintain F-1 status for the full academic year preceding their

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

access to practical training. *See* 8 C.F.R. § 214.2(f)(10). This will significantly disrupt those students' career plans and opportunities, further undermining the value of the educational experience that Washington institutions can provide to F-1 visa students. It can be reasonably expected that many students will take leaves of absence or withdraw as a direct result of the July 6 Directive.

70.     When this occurs, Washington institutions will be harmed both in their ability to carry out their educational missions, and by loss of revenue when students leave or withdraw and do not make expected tuition payments. By threatening to force many F-1 students to withdraw from Washington institutions, Defendants have put these institutions to an impossible choice: lose numerous students who bring immense educational and financial benefits to the school, or take steps to retain those students through in-person classes, even where those steps contradict each school's judgment about how best to protect the health of the students, faculty, staff, and university communities as a whole.

71.     The State—and the country as a whole—will also be harmed by the potential loss of F-1 visa holders who are working on critical COVID-19 research, including efforts to develop a vaccine as well as data analysis and forecasting used to understand and control the spread of COVID-19 until a vaccine is developed.

72.     For example, the University of Washington's Institute for Health Metrics and Evaluation (IHME) has produced COVID-19 forecasts that have been used at many levels of government. IHME's forecasts have been used in local resource allocation decisions within the University's medical school and Washington state, within state government across the United States, by the White House, and by multiple ministries of health and offices of planning around the world. IHME has PhD students on F-1 visas working directly on IHME's COVID-19 model and contributing critical input on data analysis, interpretation and dissemination. If the University of Washington is forced to switch to a fully online model this fall, these critical researchers would be forced to leave the country.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    73.    The Administration has acknowledged that ICE's decision is designed to force

2  educational institutions to conduct in-person classes even if, in those institutions' and local public

3  health officials' considered judgments, it is neither safe nor educationally advisable to do so. The

4  same day ICE issued the July 6 Directive, President Trump tweeted: "SCHOOLS MUST OPEN

5  IN THE FALL!!!"[24] And as Acting Deputy Secretary of Homeland Security Kenneth T.

6  Cuccinelli stated on July 7, 2020, the July 6 Directive "will . . . encourage schools to reopen."[25]

7  ICE's directive also reflects the Administration's continued efforts to limit and reduce the

8  presence of international students in the United States.

9                              **V.    CAUSES OF ACTION**

10      **Count I: Violation of APA § 706—Arbitrary and Capricious Agency Action**

11    74.    The State of Washington realleges and reincorporates by reference the allegations

12  in each of the preceding paragraphs.

13    75.    The APA requires this Court to hold unlawful and set aside any agency action

14  that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

15  5 U.S.C. § 706(2)(A).

16    76.    Agency action is arbitrary and capricious where, *inter alia*, the agency has

17  (1) "relied on factors which Congress has not intended it to consider," (2) "entirely failed to

18  consider an important aspect of the problem," (3) "offered an explanation for its decision that

19  runs counter to the evidence before the agency," or (4) "is so implausible that it could not be

20  ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*

21  *of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In all cases, the agency

22  must "cogently explain why it has exercised its discretion in a given manner." *Id.* at 48;

23  *accord Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) (the grounds for

24  agency action must be "logical and rational"). Where an agency reverses a prior policy, it must

25

[24] https://twitter.com/realDonaldTrump/status/1280209946085339136?s=20.
[25] https://thehill.com/homenews/administration/506248-cuccinelli-says-rule-forcing-international-students-to-return-home.

26

(1) "display awareness that it *is* changing position," (2) "show that there are good reasons for the new policy," including disclosing the details of any "factual findings that contradict those which underlay its prior policy," and (3) account for "serious reliance interests" engendered by the prior policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

77.     The July 6 Directive, and any "temporary final rule" that follows therefrom, are arbitrary and capricious is numerous respects, including but not limited to the following:

a.     The agency arbitrarily set an "implausible" deadline of July 15, 2020 (within 9 days of the Directive's issuance) for institutions of higher education to determine whether to partly or fully resume in-person instruction for Fall 2020, and for institutions whose classes would be entirely online to submit an "operational change plan" by the same date. The agency also set an unreasonable deadline of August 4, 2020 for institutions that have adopted a "hybrid" model—a mixture of online an in-person instruction—to certify for each student on an F-1 visa that the "program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." These deadlines do not provide institutions with sufficient time to make the required decisions and certifications, particularly in the midst of a pandemic that has drastically disrupted normal operations.

b.     The agency reversed its prior policy of permitting students to attend remote classes while retaining their visa status "for the duration of the emergency," without providing any "factual findings that contradict those which underlay its prior policy" (including providing no facts to support the suggestion that the emergency reached its "height" in March 2020), and without considering the "serious reliance interests engendered by the prior policy." "When an agency changes course, as DHS did here, it must be cognizant" of "serious reliance interests" that its prior approach has "engendered." *Dept. of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

22

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1913 (2020). "It would be arbitrary and capricious to ignore such matters." *Id.* Yet that is exactly what the July 6 Directive does. It departs from prior guidance that ICE issued on this subject—including its explicit statement on March 13 that the exemptions for F-1 visa holders due to COVID-19 would be "in effect for the duration of the emergency"— without any reasoned basis for the sudden and dramatic change of position or any consideration of the reliance interests of the State of Washington, its institutions of higher education, or their students.

c.      The agency "entirely failed to consider an important aspect of the problem": namely, the significant effects that the Directive will have on institutions that have invested considerable time and effort in developing plans for the 2020–2021 academic year—plans that carefully balance the health and safety of faculty, students, and staff, with their core mission of educating students. The July 6 Directive likewise fails to consider the devastating effects that it will have on international students who will be forced to leave the United States or will be unable to enter to take classes, or those who will not be able to return to their home—or any—country.

d.      The agency failed to offer any cogent explanation for the July 6 Directive, which reflects virtually no reasoned decisionmaking. It identifies a purported "need to resume the carefully balanced protections implemented by federal regulations," but it does not provide any reasoning why the agency perceives such a need to exist, nor why any resumption of the regime set out in federal regulations must begin in less than two months, while the COVID-19 pandemic continues to rage and the national state of emergency remains in effect.

e.      Indeed, the lack of any real justification for the July 6 Directive on its face "reveal[s] a significant mismatch between the [July 6 Directive] and the rationale . . . provided," *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2775 (2019), raising the prospect that the July 6 Directive is being used as a cudgel to compel

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

universities to alter their plans for the fall. As Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli stated on July 7, 2020, the true purpose of the July 6 Directive was to "encourage schools to reopen" notwithstanding State and local safety conditions amidst the ongoing pandemic. ICE's decision also reflects the Administration's continued efforts to limit and reduce the presence of F-1 international students in the United States.

78.     For these reasons and others, the July 6 Directive, and any "temporary final rule" that follows therefrom, must be enjoined, vacated, and set aside as arbitrary and capricious. 5 U.S.C. § 706(2)(A).

**Count II: Violation of APA §§ 553, 706—Notice-and-Comment Requirements**

79.     The State of Washington realleges and reincorporates by reference the allegations in each of the preceding paragraphs.

80.     Under the APA, a court must set aside agency action that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

81.     The APA requires federal agencies engaged in rulemaking to comply with notice-and-comment procedures. 5 U.S.C. § 553(b). Among other things, agencies must publish notices of proposed rulemaking describing "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Following publication of adequate notice, agencies must then give interested persons at least 30 days to comment on the proposed rule. "A decision made without adequate notice and comment is arbitrary or an abuse of discretion." *NRDC v. U.S. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

82.     The July 6 Directive, and any "temporary final rule" that follows therefrom, are subject to these notice-and-comment requirements. The Directive is a "rule" within the meaning of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Yet the agency entirely failed to comply with the notice-and-comment requirements.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

83.     There are no applicable exceptions to the notice-and-comment requirements. For instance, the July 6 Directive is not an "interpretative rule[], general statement[] of policy, or rule[] of agency organization, procedure, or practice." 5 U.S.C. § 553(b). To the contrary, it is a substantive rule that alters institutions' and students' rights and obligations under the law. Absent "good cause," the agency was required to comply with the notice-and-comment requirements, but has made no reasoned "good cause" finding to excuse its failure to do so—nor could it.

84.     The July 6 Directive, and any "temporary final rule" that follows therefrom, were unlawfully issued without notice or an opportunity to comment, in violation of 5 U.S.C. § 553, and must be enjoined, vacated, and set aside. 5 U.S.C. § 706(2).

### Count III: Violation of APA § 706—*Ultra Vires* Agency Action

85.     The State of Washington realleges and reincorporates by reference the allegations in each of the preceding paragraphs.

86.     Under the APA, courts must set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations[.]" 5 U.S.C. § 706(2)(C).

87.     The July 6 Directive is in excess of the authority delegated to the agency by statute to the extent it interferes with the State of Washington's ability to exercise its police power and set its own policies to protect the health and safety of its residents during the COVID-19 pandemic. ICE lacks any statutory authority to override State health and safety measures by attempting to coerce public and private institutions of higher education within Washington to reopen in order to avoid drastic impacts on their students with F-1 visas.

88.     The July 6 Directive, and any "temporary final rule" that follows therefrom, are *ultra vires* agency actions that must be enjoined, vacated, and set aside. 5 U.S.C. § 706(2).

### VI.     PRAYER FOR RELIEF

WHEREFORE, the State of Washington requests that the Court enter a judgment against Defendants and award the following relief:

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1     a.     Issue a temporary restraining order, a preliminary injunction, and a permanent

2    injunction prohibiting Defendants from implementing or enforcing the July 6 Directive and any

3    "temporary final rule" that follows therefrom;

4     b.     Declare that the July 6 Directive and any "temporary final rule" that follows

5    therefrom are unlawful and without force or effect;

6     c.     Vacate and set aside the July 6 Directive and any "temporary final rule" that

7    follows therefrom;

8     d.     Award the State of Washington its costs and reasonable attorneys' fees; and

9     e.     Award such additional relief as the interests of justice may require.

10    DATED this 10th day of July, 2020.

11

12                            ROBERT W. FERGUSON
                                Attorney General

13                            */s/ Lauryn K. Frass*

14                            LAURYN K. FRAAS, WSBA No. 53238
                                Assistant Attorney General

15                            206.521.5811
                                lauryn.fraas@atg.wa.gov

16

17                            */s/ Kristin Beneski*
                                KRISTIN BENESKI, WSBA No. 45478

18                            Assistant Attorney General
                                206.464.7459

19                            kristin.beneski@atg.wa.gov

20                            */s/ Spencer W. Coates*
                                SPENCER W. COATES, WSBA No. 49683

21                          Assistant Attorney General
                                206.287.4173

22                          spencer.coates@atg.wa.gov

23                          State of Washington Attorney General's Office

24                          800 5th Avenue, Suite 2000
                                Seattle, WA  98104

25

26                          *Attorneys for Plaintiff State of Washington*

COMPLAINT FOR DECLARATORY       26       ATTORNEY GENERAL OF WASHINGTON
AND INJUNCTIVE RELIEF                         Complex Litigation Division
                                              800 5th Avenue, Suite 2000
                                              Seattle, WA 98104-3188
                                              (206) 464-7744

# Exhibit 1

**Broadcast Message: COVID-19 and Fall 2020**

**To:** All SEVIS Users

**Date:** July 6, 2020
**Number:** 2007-01

---

**General Information**

Temporary procedural adaptations related to online courses permitted by the Student and Exchange Visitor Program (SEVP) during the height of the Coronavirus Disease (COVID-19) crisis will be modified for the fall 2020 semester. There will still be accommodations to provide flexibility to schools and nonimmigrant students, but as many institutions across the country reopen, there is a concordant need to resume the carefully balanced protections implemented by federal regulations. The U.S. Department of Homeland Security plans to publish the procedures and responsibilities described in the below Broadcast Message in the near future as a Temporary Final Rule in the Federal Register. This message is intended to provide additional time to facilitate the implementation of these procedures.

Due to COVID-19, SEVP instituted a temporary exemption regarding the online study policy for the spring and summer semesters. This policy permitted F and M students to take more online courses than normally allowed for purposes of maintaining a full course of study to maintain their F-1 and M-1 nonimmigrant status during the COVID-19 emergency.

**Temporary Exemptions for the Fall 2020 Semester**
For the fall 2020 semester, SEVP is modifying these temporary exemptions. In summary, temporary exemptions for the fall 2020 semester provide that:

1) Students attending schools operating entirely online may ***not*** take a full online course load and remain in the United States. The U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States. Active students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings.

2) Students attending schools operating under normal in-person classes are bound by existing federal regulations. Eligible F students may take a maximum of one class or three credit hours online (*see 8 CFR 214.2(f)(6)(i)(G)*).

3) Students attending schools adopting a hybrid model—that is, a mixture of online and in person classes—will be allowed to take more than one class or three credit hours online. These schools must certify to SEVP, through the Form I-20, "Certificate of Eligibility for Nonimmigrant Student Status," that the program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking

the minimum number of online classes required to make normal progress in their degree program.  The above exemptions do not apply to F-1 students in English language training programs or M-1 students, who are not permitted to enroll in any online courses (see *8 CFR 214.2(f)(6)(i)(G)* and *8 CFR 214.2(m)(9)(v)*)).

**Forms I-20 Requirements and Maintaining Student Records for the Fall 2020 Semester**

For all students attending schools in the United States this fall 2020, designated school officials (DSOs) must issue new Forms I-20 to each student certifying that the school is not operating entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program. DSOs must indicate this information in the Form I-20 Remarks field in the Student and Exchange Visitor Information System (SEVIS).

Schools must update and reissue all Forms I-20 to reflect these changes in program enrollment and student information within 21 business days of publication of this Broadcast Message (by Aug. 4, 2020.) When issuing new Forms I-20, please prioritize students who require new visas and are outside of the country.

For the fall 2020 semester, continuing F and M students who are already in the United States may remain in Active status in SEVIS if they make normal progress in a program of study, or are engaged in approved practical training, either as part of a program of study or following completion of a program of study. If a school changes its operational stance mid-semester, and as a result a nonimmigrant student switches to only online classes, or a nonimmigrant student changes their course selections, and as a result, ends up taking an entirely online course load, schools are reminded that nonimmigrant students within the United States are not permitted to take a full course of study through online classes. If nonimmigrant students find themselves in this situation, they must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction.

For the fall 2020 semester, continuing F and M students outside of the United States, whose schools of enrollment are only offering online classes, may remain in Active status in SEVIS if they are taking online courses and are able to meet the normal full course of study requirements or the requirements for a reduced course of study. Only students enrolled at a school that is only offering online coursework can engage in remote learning from their home country. In this case, DSOs should annotate the student's record to make it clear that the student is outside the US but taking full time online courses as that is the only choice offered by the school.

**School Reporting and Procedural Requirements**

1) Schools that offer ***entirely online classes or programs*** or ***will not reopen*** for the fall 2020 semester ***must*** complete an operational change plan and submit it to SEVP@ice.dhs.gov no later than Wednesday, July 15, 2020. The subject line must read: "Fall 2020 (Fully Online/Will not Reopen) – School Name and School Code."

2) Certified schools that will not be entirely online but will reopen in the fall and that will use any of the following educational formats must update their operational plans by August 1, 2020 and include whether they will be:

- Solely in-person classes, or

- Delayed or shortened sessions, or

- A hybrid plan of in-person and remote classes.

These plans shall also be submitted to SEVP@ice.dhs.gov and the subject line must read: "Fall 2020 (in person/hybrid/modified session) – School Name and School Code

3) Schools should update their operational plans if circumstances regarding their operational posture change within 10 calendar days.

SEVP will continue to develop and provide resources to stakeholders on ICE.gov, including answers to frequently asked questions, to clarify and expand upon information in this Broadcast Message.

**Disclaimer**

This Broadcast Message is not a substitute for applicable legal requirements, nor is it itself a rule or a final action by SEVP. It is not intended to, does not, and may not be relied upon to create any right or benefit, substantive or procedural, enforceable at law by any party in any administrative, civil or criminal matter.

