1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Ricardo S. Martinez

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

STATE OF WASHINGTON,

                Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY;
IMMIGRATION AND CUSTOMS
ENFORCEMENT; CHAD F. WOLF, in his
official capacity as Acting Secretary of the
U.S. Department of Homeland Security;
and MATTHEW ALBENCE, in his official
capacity as Acting Director of U.S.
Customs and Immigration Enforcement,

                Defendants.

NO. 2:20-cv-01070-RSM

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
(With Notice to Adverse Party)[1]

NOTE ON MOTION CALENDAR:
**JULY 13, 2020**

**ORAL ARGUMENT REQUESTED**

---

[1] The undersigned counsel notified the U.S. Department of Justice that this motion was forthcoming by email on July 10, 2020 and attached a copy of the complaint. A copy of this motion will be emailed to the Department of Justice promptly upon filing, and copies of the complaint and motion will be served today as well.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**TABLE OF CONTENTS**

I.     INTRODUCTION................................................................................................ 1

II.    RELEVANT FACTS ......................................................................................... 3

     A.    The COVID-19 Pandemic ..................................................................... 3

     B.    ICE's Initial Response to the Pandemic ............................................... 3

     C.    Without Warning, ICE Announces It Will End the March 13 Exemption ............... 4

     D.    The Directive's Impact on Washington, Its Schools, and Their Students ................ 5

III.   ARGUMENT ................................................................................................... 9

     A.    Legal Standard ...................................................................................... 9

     B.    The State Is Likely To Succeed on the Merits ...................................... 9

         1.    The State Has Standing to Bring This Action ................................. 10

         2.    ICE's New Directive Is Subject to APA Review ........................... 10

         3.    ICE's New Directive Is Arbitrary and Capricious ......................... 11

             a.    ICE imposed arbitrary and untenable compliance deadlines................... 11

             b.    ICE failed to consider the serious harms its Directive will impose.......... 13

             c.    ICE failed to consider widespread reliance its promise that the March 13 Exemption would last "for the duration" of the pandemic....... 15

             d.    ICE failed to provide a plausible rationale for the Directive.................... 16

         4.    ICE's New Directive Violates the APA's Notice and Comment Requirements................................................................................. 17

     C.    The State Will Be Irreparably Harmed Absent Emergency Relief......................... 18

     D.    The Remaining Equitable Factors Favor a Temporary Restraining Order............. 24

IV.   CONCLUSION ................................................................................................ 24

EMERGENCY MOTION FOR            i            ATTORNEY GENERAL OF WASHINGTON
TEMPORARY RESTRAINING ORDER                         Complex Litigation Division
NO. 2:20-cv-01070-RSM                               800 5th Avenue, Suite 2000
                                                   Seattle, WA 98104-3188
                                                      (206) 464-7744

# I.    INTRODUCTION

On July 6, 2020, Defendants (collectively, ICE) promulgated a cruel and capricious rule that will force many international students to leave the United States in a matter of days during a global pandemic (the "Directive"). The Directive rescinds the emergency exemptions allowing international students to study remotely during the COVID-19 pandemic, and will bar the approximately 27,000 international students in the State of Washington from the United States if at any time this fall their colleges or universities decide for safety reasons to move to online-only learning. At the same time, the ICE Directive conversely requires international students attending institutions with "hybrid" or fully in-person instruction to return to the United States for in-person classes or lose their visa status. The Directive forces Washington institutions to make an impossible choice: lose many of their international students, who confer enormous benefits to their schools and to the State; or act contrary to State public-health guidance and their own considered judgments about how best to protect the health of their students, faculty, staff, and the surrounding public. The Directive is supported by neither logic nor law. Instead, it was promulgated in an apparent attempt to enforce President's July 6 tweet that "SCHOOLS MUST OPEN IN THE FALL!!!"[2] This Court should enter a temporary restraining order to prevent immediate irreparable harm from the Directive, which will begin affecting students' visa status as of Wednesday, July 15, 2020—nine days from the Directive's issuance.

In March 2020, amid the onset of the COVID-19 pandemic, ICE published guidance establishing an exemption from a preexisting rule that required students on nonimmigrant student visas (F-1 or M-1 visas)[3] to attend classes in person (the "March Exemption"). ICE stated that the Exemption, which allowed students to maintain their visa status while attending classes remotely, would be "in effect for the duration of the emergency[.]" Relying on the March Exemption, institutions undertook to determine how best to conduct classes in the fall as the

---

[2] Donald Trump (@realDonaldTrump), Twitter (July 6, 2020, 11:40 AM PST), Coates Ex. D.
[3] F-1 visas are for academic study while M-1 visas are for vocational or technical study. Compl. ¶ 38.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

1

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

pandemic rages on, while accounting for State public-health guidance and unpredictable, changing circumstances. Some colleges had already decided to remain only or predominately online in fall 2020. Others had already decided to adopt a hybrid approach with some in-person classes, depending in some cases on State reopening plans. Still others have adopted a hybrid approach for most of the fall, and then switch to online-only instruction after Thanksgiving. The ICE Directive has thrown a wrench into these carefully thought-through plans.

The Directive requires institutions to decide by Wednesday, July 15 whether they will be online-only, and to submit an "operational change plan" by that date if so. Students attending online-only institutions must then leave the United States immediately or risk detention and deportation. Conversely, the Directive requires students attending institutions with a mixture of in-person and online classes to return to (or remain in) the United States to attend in-person classes or lose their visa status. Institutions adopting hybrid or in-person approaches must submit their "operational plans" by August 1, and hybrid institutions must issue updated certifications of eligibility for *each* student holding an F-1 or M-1 visa by August 4—just 21 business days after the change was announced.

In issuing its stunning reversal of its own COVID-19 Exemption, ICE gave no indication that the agency considered, much less adequately addressed, numerous weighty interests—including the health of students, faculty, staff, and local communities, and the reliance of students and universities on ICE's promise that the Exemption would last "for the duration" of the pandemic. Nor did the agency provide any opportunity whatsoever for notice and comment. Accordingly, the Directive is arbitrary and capricious and unlawful under the Administrative Procedure Act (APA). And if allowed to go into effect, Washington's public institutions stand to lose tens of millions in revenue and suffer significant harm to their educational missions. The health and safety of Washington residents will also be put at risk. Accordingly, this Court should enter a temporary restraining order preventing Defendants from implementing or enforcing the Directive, pending briefing and a decision on a motion for a preliminary injunction.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

2

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

## II.   RELEVANT FACTS

### A.   The COVID-19 Pandemic

As the Court is well aware, the COVID-19 pandemic has created extreme challenges for the operations of businesses, schools, and virtually every aspect of daily life. COVID-19 is easily transmitted, especially indoors, and the numbers of confirmed U.S. cases and deaths have grown exponentially since January 2020, and are expected to continue to do so. *See* Compl. ¶¶ 21–37. As of this filing, the number of new confirmed cases in Washington is at an all-time high. *Id.* ¶ 37. To date Washington has over 40,000 confirmed cases, over 4,700 hospitalizations, and over 1,400 deaths.[4] *Id.* On February 29, 2020, Governor Jay Inslee declared a statewide state of emergency in response to the COVID-19 pandemic. Compl. ¶ 26. Soon thereafter, on March 13, 2020, President Donald J. Trump declared a national emergency. *Id.* ¶ 29.

In response to increasing COVID-19 infection rates, on March 6, 2020, the University of Washington (UW) became the first American university to announce it was suspending in-person classes. Cauce Decl. ¶ 12. Shortly thereafter, the State of Washington prohibited in-person classroom instruction and lectures. *Id.*; Compl. ¶ 28. Campuses have a heightened risk for transmission of the virus that causes COVID-19: crowded classrooms, dining facilities, and dormitories could cause large-scale outbreaks. *See* Compl. ¶ 33; *see also* Cauce Decl. ¶ 31 (discussing the recent outbreak of COVID-19 within UW's fraternity system). Notwithstanding mitigation measures, cases continue to rise nationwide and in Washington State. Compl. ¶ 37.

### B.   ICE's Initial Response to the Pandemic

Eligibility to maintain F-1 visa status is governed by 8 U.S.C. § 1101(a)(15)(F)(i), which requires students to enroll in a "full course of study"; and 8 C.F.R. § 214.2(f) and (m), which generally limit the number of online credits F-1 and M-1 visa holders may enroll in.

Early in the pandemic, the federal government recognized that remote instruction was

---

[4] Washington Department of Health, COVID-19 Data Dashboard (last updated Jul. 11, 2020), https://www.doh.wa.gov/Emergencies/NovelCoronavirusOutbreak2020COVID19/DataDashboard.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

3

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

the only way for many institutions to both protect their students' health and safety and carry out their educational missions. On March 9, 2020, ICE's Student and Exchange Visitor Program (SEVP) division issued guidance recognizing the "fluid and rapidly changing" nature of the situation and stating that the agency "intend[ed] to be flexible with temporary adaptations," including "online instruction." Coates Ex. A. Four days later, when President Trump declared a national state of emergency in response to COVID-19, SEVP issued another guidance document expressly exempting F-1 and M-1 visa holders from the rule that they must attend most classes in person (the "March Exemption"). Coates Ex. B. The March 13 Exemption provided that "[g]iven the extraordinary nature of the COVID-19 emergency, SEVP will allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study," whether the student remained in the United States or departed the United States. *Id.* The agency stated that this Exemption would be "in effect for the duration of the emergency[.]" *Id.*

**C.**    **Without Warning, ICE Announces It Will End the March 13 Exemption**

Last week, on July 6, 2020, ICE abruptly changed course, throwing higher education institutions into chaos and causing significant anxiety among international students. The July 6 Directive rescinds the March Exemption, requiring all students on F-1 and M-1 visas whose curricula are entirely online due to COVID-19 to depart the country if they are currently present, and barring their reentry if they are currently abroad. Compl. Ex. 1. Reports indicate that ICE has already begun enforcing this policy and barring students' entry. Coates Ex. C. ICE is requiring schools to decide by Wednesday, July 15, whether they will be fully online or partly resume in-person education, and to submit an "operational change plan" if classes will be online-only. Compl. Ex. 1. Schools taking a "hybrid" approach (a mixture of online and in-person classes) or returning to in-person classes must submit an "operational plan" by August 1, 2020. *Id.* at 2. These schools must also "update and reissue" all Forms I-20 (Certificate of Eligibility for Nonimmigrant Student Status) for all students with an F-1 or M-1 visa by August 4, 2020, certifying that each individual student "is not taking an entirely online course load for the fall

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

4

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program." *Id.* at 1-2. In addition, the Directive makes clear that if a hybrid school "changes its operational stance" or a nonimmigrant student "ends up taking an entirely online course load," "they must leave the country or take alternative steps to maintain their nonimmigrant status such as transfer to a school with in-person instruction." *Id.* Finally, the Directive specifies that "[o]nly students enrolled at a school that is only offering online coursework can engage in remote learning from their home country." *Id.* at 2.

ICE announced this sea change without public notice or an opportunity to comment, and without any suggestion that it considered the health of students, faculty, staff, or surrounding communities; students' and schools' reliance on ICE's promise that the March Exemption would be "in effect for the duration of the emergency" posed by COVID-19; or the absence of other options for schools to provide their curriculum to many of their international students.

**D.    The Directive's Impact on Washington, Its Schools, and Their Students**

Washington public and private institutions of higher education educate tens of thousands of international students each year. Compl. ¶ 61. These students contributed almost a billion dollars (an estimated $956,133,414) to Washington's economy in the 2018-2019 academic year. *Id.*; *see also* Yoshiwara Decl. ¶ 48. Each of Washington's six public four-year universities, all 34 public two-year colleges, and 26 private colleges enrolled international students in Fall 2018—"virtually all" of whom were here on F or M visas. Meotti Decl. ¶¶ 13–15.

UW, the State's flagship research university, has approximately 8,300 enrolled F visa students from 123 countries, who contribute an estimated $185 million in annual revenue to UW; approximately 1,300 participate in Optional Practical Training (OPT).[5] Cauce Decl. ¶ 7. In addition, UW has approximately 2,300 newly admitted F-1 visa students for enrollment in fall 2020. *Id.* ¶ 10. Washington State University (WSU) currently has 1,869 enrolled students with

---

[5] OPT is temporary employment directly related to an F-1 student's major area of study. Eligible students can apply to receive up to 12 months of OPT employment authorization before and/or after completing their academic studies. *See* Optional Practical Training (OPT) for F-1 Students, https://www.uscis.gov/opt.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

5

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   F-1 visas from more than 100 countries, plus 853 newly admitted international students, who

2   would contribute $31.1 million in revenue this academic year. Chaudhry Decl. ¶¶ 7–8, 27. In

3   2019-2020, Central Washington University's (CWU) 343 international students on F-1 visas

4   contributed more than $14.6 million in revenue. Schactler Decl. ¶ 11. In 2018-2019,

5   Washington's Community and Technical Colleges collectively had 11,385 international students

6   from more than 40 countries who contributed approximately $107,673,637 in tuition. Yoshiwara

7   Decl. ¶ 8. Several Washington community colleges serve especially large numbers of

8   international students, and rely heavily on their tuition payments for financial viability. *See, e.g.*,

9   *id.* ¶ 9 (Bellevue College: 970 international students); Stewart Decl. ¶¶ 5, 8 (Green River

10  College: 750 currently enrolled and 318 F-1 applicants for fall); Pan Decl. ¶ 6 (Seattle Colleges,

11  multi-college district with eight institutions: 6,220 students with F-1 or M-1 visas in 2019-2020).

12          ICE's Directive puts these institutions to an impossible choice: lose numerous students

13  who bring immense educational and financial benefits to the school, or take steps to retain those

14  students by offering more in-person classes. As UW President Ana Mari Cauce explains, the

15  Directive "force[s] the University to choose between the health and safety of the entire

16  University community and the potentially acute risks faced by its substantial international

17  student population along with the financial risks that losing that population would cause to the

18  University." Cauce Decl. ¶ 30. If the Directive is not enjoined, these institutions expect many of

19  their international students to transfer, take leave, or disenroll for fall 2020. This is likely to occur

20  for a variety of reasons, including: (i) students at online-only schools will seek to transfer to

21  schools offering in-person instruction to maintain their visa status; (ii) many students cannot

22  feasibly continue their studies due to conditions or practical obstacles in their home country; (iii)

23  students who lose their visas will also lose their OPT work authorization and may withdraw from

24  their program of study as a result; and/or (iv) students will choose not to enroll in the fall knowing

25  they will be forced to leave the United States or lose their visa status once classes are no longer

26  in session, whether at the end of the fall or at an unknown earlier date if the pandemic forces

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

6

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

their school to return to remote instruction; among other factors. *See* Cauce Decl. ¶ 19; Chaudry Decl. ¶ 21; Yoshiwara Decl. ¶ 33–34; Kaminski Decl. ¶ 8. For example, CWU estimates 26% of its international students will disenroll as a direct result of the Directive. Schactler Decl. ¶ 26.

For months, Washington institutions have engaged in deliberate processes to determine how to conduct classes in the fall, while accounting for State public-health guidance and unpredictable, changing circumstances. *See, e.g.*, Schactler Decl. ¶¶ 18–20; Yoshiwara Decl. ¶ 32; Chaudhry Decl. ¶¶ 12–18; Cauce Decl. ¶¶ 14–17; Kaminski Decl. ¶¶ 3–7. In doing so, these institutions explicitly relied on ICE's statement that the March Exemption would remain "in effect for the duration of the emergency." *See, e.g.*, Schactler Decl. ¶¶ 21–23; Yoshiwara Decl. ¶ 29; Pan Decl. ¶¶ 8, 14; Cauce Decl. ¶ 13; Harrell Decl. ¶ 14; Kaminski Decl. ¶ 5.

In planning for fall 2020, institutions' working groups and taskforces met regularly internally and with health professionals, local and state governments and planning commissions, and the public for weeks or months to develop educational plans that appropriately balanced student and community health with educational opportunity. *See, e.g.*, Stewart Decl. ¶¶ 11-15; Yoshiwara Decl. ¶¶ 22-28; Pan Decl. ¶¶ 11-13; Harrell Decl. ¶¶ 14-23; Chaudhry Decl. ¶¶ 12-18; Cauce Decl. ¶¶ 11-18. Each school's plan was based on its unique circumstances. Yakima Valley College (YVC), for instance, determined that due to the high incidence of COVID-19 cases in its region, it could not safely offer in-person instruction in fall 2020. Kaminski Decl. ¶ 4; Yoshiwara Decl. ¶ 32. WSU, by contrast, is planning a hybrid approach for most of the fall, but will switch to online-only after Thanksgiving. Chaudhry Decl. ¶¶ 15, 18. UW is also planning a hybrid approach for its multiple campuses—but only if the campus's county is in Phase 3 of Washington's Safe Start plan.[6] Cauce Decl. ¶¶ 13, 15. Most Washington institutions plan to offer a hybrid approach with limited in-person instructional opportunities, but only as the pandemic permits. *See, e.g.*, Yoshiwara Decl. ¶ 18; Stewart Decl. ¶ 13; Pan Decl. ¶¶ 21–22;

---

[6] Office of the Governor, Safe Start Washington: Phased Reopening County-by-County, https://www.governor.wa.gov/sites/default/files/SafeStartPhasedReopening.pdf (last updated July 7, 2020).

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

7

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   Harrell Decl. ¶¶ 32–33; Schactler Decl. ¶ 28.

2       ICE's Directive disrupts these institutions' carefully calibrated planning. Institutions are

3   being inundated with questions from panicked and confused students whose immigration status

4   and plans for the upcoming academic year are now in jeopardy. *See, e.g.*, Chaudhry Decl. ¶ 19

5   (describing the "shock, fear, outrage and extreme anxiety" of WSU faculty, staff, students, and

6   families, its receipt of more than 500 emails within 24 hours, and attendance of 300+ at an

7   "impromptu town hall" with two hours' notice); Reid Decl. ¶¶ 3–4 (anxiety among UW's student

8   body). Students must quickly try to arrange to take at least one in-person class to maintain their

9   visa status, with no exception if the pandemic forces classes to pivot back to all-online, and

10  regardless of whether preexisting health conditions place the student at greater risk for serious

11  complications or death from COVID-19. *See, e.g.*, Yoshiwara Decl. ¶ 32; Cauce Decl. ¶ 18.

12      The Directive also places a tremendous administrative burden on institutions that will

13  take a hybrid approach, requiring a new certification for each and every F-1 and M-1 student by

14  August 4, 2020. Compl. Ex. 1 at 2. For many institutions, this arbitrary 21-day deadline is

15  virtually impossible to meet. *See, e.g.*, Reid Decl. ¶¶ 10, 12, 16 (UW must issue "completely

16  new I-20s for the over 8,000 international students enrolled at the University," which it lacks

17  sufficient staffing to accomplish, and because of UW's quarter system it will "not even know

18  what courses many international students will register for" until the end of August); Chaudhry

19  Decl. ¶ 20 (reissuing "a minimum of 1900" I-20s by August 4 is a "nearly impossible task" for

20  which WSU must hire new staff); Schactler Decl. ¶¶ 24, 29–30; Yoshiwara Decl. ¶ 43; Kaminski

21  Decl. ¶ 17. Moreover, if State or local public-health requirements mandate school closure at any

22  point during the fall term, international students would have to immediately leave the country or

23  risk facing deportation proceedings. Schactler Decl. ¶ 24. Notwithstanding all this uncertainty,

24  the ICE Directive requires institutions to make their choice known by July 15, 2020.

25      The State filed its Complaint on Friday, July 10. Dkt. # 1. The State seeks a temporary

26  restraining order against the Directive prior to its initial compliance date of July 15, 2020.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

8

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

| | |
|---|---|
| 1 | **III.     ARGUMENT** |
| 2 | **A.     Legal Standard** |
| 3 | A party seeking a temporary restraining order must make a clear showing of (1) a |
| 4 | likelihood of success on the merits, (2) a likelihood of suffering irreparable harm in the absence |
| 5 | of preliminary relief, (3) that the balance of hardship tips in her favor, and (4) that a temporary |
| 6 | restraining order in is in the public interest. Fed. R. Civ. P. 65(c); *Winter v. Nat. Resources Def.* |
| 7 | *Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d |
| 8 | 832, 839 n.7 (9th Cir. 2001) (preliminary injunction and temporary restraining order standards |
| 9 | are "substantially identical"). While all factors are met here, "[h]ow strong a claim on the merits |
| 10 | is enough depends on the balance of harms: the more net harm an injunction can prevent, the |
| 11 | weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief." |
| 12 | *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1133 (9th Cir. 2011) (citation omitted). |
| 13 | **B.     The State Is Likely To Succeed on the Merits** |
| 14 | The State is likely to succeed on the merits. The Administrative Procedure Act (APA) |
| 15 | directs courts to "set aside" agency action that is "arbitrary, capricious, [or] an abuse of |
| 16 | discretion," "in excess of statutory jurisdiction, authority, or limitations," or "without observance |
| 17 | of procedure required by law." 5 U.S.C. § 706(2). The Directive is arbitrary and capricious for |
| 18 | at least four reasons: it (i) sets arbitrary and implausible compliance deadlines of July 15, |
| 19 | August 1, and August 4; (ii) fails to consider important aspects of the problem; (iii) reverses |
| 20 | ICE's prior policy absent factual support or consideration of serious reliance interests; and (iv) |
| 21 | offers no cogent explanation for the new policy. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.* |
| 22 | *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *FCC v. Fox Television Stations, Inc.*, |
| 23 | 556 U.S. 502, 515 (2009).[7] The Directive also patently violates the APA's notice-and-comment |
| 24 | |
| 25 | |
| 26 | |

---

[7] Judicial review of agency action is based on the administrative record. 5 U.S.C. § 706. The Court may look beyond the record where, *inter alia*, it is "necessary to determine whether the agency has considered all relevant factors and has explained its decision[.]" *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005). Here, the State it is likely to succeed on the merits because the Directive is arbitrary and capricious on its face. Additionally, it is appropriate for the Court to consider the declarations cited herein under *Lands Council*.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

9

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    requirements, having been issued with no prior notice whatsoever. 5 U.S.C. §§ 553, 706(2).

2    **1.    The State Has Standing to Bring This Action**

3    As the operator of its public institutions of higher education, Washington is directly

4    subject to the Directive and will suffer proprietary harm as a result. *Washington v. Trump*, 847

5    F.3d 1151, 1161 (9th Cir. 2017). State institutions educate thousands of students with F-1 visas

6    each year, and will suffer harm to their educational missions and financial losses if these students

7    are forced to disenroll as a result of the Directive, which is what will happen here. *See supra* at

8    6–7. International students are valued members of State institutions' communities, contribute

9    diverse experiences and perspectives to the educational setting, pay full out-of-state tuition, and

10   are otherwise a significant source of revenue for State institutions. Moreover, as explained

11   below, F-1 visa students contribute directly to Washington's economy while they reside here,

12   bringing almost a billion dollars into the State each year, and often go on to build their lives in

13   Washington and contribute to the State as employers, workers, consumers, and taxpayers.

14   Washington's sovereign and quasi-sovereign interests in protecting the health, safety,

15   and well-being of its residents are also at stake. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,*

16   *ex rel., Barez*, 458 U.S. 592, 607 (1982). Washington's adoption of public-safety measures in

17   response to the COVID-19 pandemic are an exercise of its police power. *See, e.g.*, *Nat'l Fed'n*

18   *of Indep. Bus. v. Sebelius*, 567 U.S. 519, 535–36 (2012) (describing police powers reserved to

19   States). The Directive infringes on Washington's exercise of its police powers by forcing schools

20   to rapidly decide whether to fully or partly resume in-person instruction this fall, and by seeking

21   to coerce schools into reopening without the opportunity to adequately account for safety

22   considerations or respond to changed circumstances amidst a rapidly evolving and unpredictable

23   pandemic.

24   **2.    ICE's New Directive Is Subject to APA Review**

25   Under the APA, a "final agency action" is subject to judicial review. 5 U.S.C. § 704. "A

26   'final' agency action is one that both determines rights or obligations from which legal

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

10

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

consequences will flow and marks the consummation of the agency's decisionmaking process." *Hyatt v. Office of Mgmt. & Budget*, 908 F.3d 1165, 1172 (9th Cir. 2018) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)) (cleaned up). Considerations relevant to finality include: "(a) whether the action is a definitive statement of an agency's position, (b) whether it has a direct and immediate effect on the complaining parties, (c) whether it has the status of law, and (d) whether it requires immediate compliance." *Oregon v. Ashcroft*, 368 F.3d 1118, 1146–47 (9th Cir. 2004) (cleaned up). Finality for APA purposes is a "pragmatic and flexible" inquiry: "It is the effect of the action and not its label that must be considered." *Ore. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982, 985 (9th Cir. 2006) (cleaned up).

Here, all four considerations demonstrate that the Directive is a final agency action. It is a "definitive statement" of ICE's position that, in fact, will be published "in the near future as a Temporary Final Rule in the Federal Register."[8] It has a "direct and immediate effect" on the State, its institutions of higher education, and their students, because it requires compliance beginning July 15 and imposes immediate consequences by altering the status of student visas, depending on whether students are taking in-person classes or not. For the same reasons, the Directive "has the status of law"; indeed, reports indicate it is already being enforced and used as a basis to deny entry. Finally, the Directive plainly requires "immediate compliance," absent intervention by this Court, through its July 15, August 1, and August 4 deadlines.

### 3.   ICE's New Directive Is Arbitrary and Capricious

#### a.   ICE imposed arbitrary and untenable compliance deadlines

The July 15, August 1, and August 4 deadlines are arbitrary and capricious on their own, independent of the Directive's substantive requirements. Agency action is arbitrary and capricious where it is not "logical and rational," *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998), or where it is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *State Farm*, 463 U.S. at 43. ICE set an

---

[8] Washington seeks to enjoin both the Directive and any "Temporary Final Rule" that follows therefrom.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

11

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

arbitrary deadline of July 15—with nine days' notice—for institutions to decide whether to resume in-person instruction (and potentially adjust previous plans in light of the Directive's consequences), and for online-only institutions to submit an "operational change plan." All other operational plans must be submitted by August 1, and all institutions with a "hybrid" program must make new I-20 certifications for each and every affected student by August 4.

These deadlines do not allow sufficient time to make the required decisions and certifications, particularly in the midst of a pandemic that has drastically disrupted normal operations. Some institutions that have already decided to hold classes online must revisit their plans to determine whether changes can be made to avoid drastic harm to F-1 visa students while preserving the health and safety of faculty, staff, students, and broader communities. *See, e.g.*, Kaminski Decl. ¶¶ 10–13 (describing the significant administrative hurdles if YVC were to abandon its plan to be fully online and implement in-person or hybrid instruction and how the "short timeframe . . . before the start of the fall quarter" makes it "difficult for the College to change course"); Chaudhry Decl. ¶¶ 19–20 (WSU reevaluation of its plans in response to the Directive). ICE offered no logical rationale for forcing schools to rush into these decisions in a matter of days, nor could it. Nor does the Directive account for the fact that some institutions' ability to offer in-person classes is dependent upon the determinations of public health officials, which cannot be predicted weeks ahead of time. *See, e.g.*, Cauce Decl. ¶¶ 15, 18 (UW's hybrid approach is dependent upon the Safe Start plan); Reid Decl. ¶ 9.

Moreover, institutions on a hybrid model have *thousands* of F-1 students for whom new I-20s must be issued by August 4. Reid Decl. ¶ 10 (UW: 8,000 I-20s); Chaudhry ¶ 20 (WSU: 1,900 I-20s). To make these certifications, institutions must scramble to accommodate students who seek to register for in-person classes, even though registration for fall classes may not be complete by early August. Reid Decl. ¶ 12 (UW); Schactler Decl. ¶ 30 (CWU). Schools have insufficient staff to meet the deadline, as the process is "complex and labor-intensive[.]" Reid Decl. ¶¶ 15–16; Chaudhry Decl. ¶ 20. A temporary restraining order is needed to provide

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

12

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1  relief from these entirely arbitrary, costly, and rapidly approaching deadlines.

2      **b.    ICE failed to consider the serious harms its Directive will impose**

3      It is a fundamental precept of administrative law that an agency must "pay[] attention to

4  the advantages *and* the disadvantages of [its] decision[]." *Michigan v. EPA*, 135 S. Ct. 2699,

5  2707 (2015). Yet the Directive reflects no consideration of its significant harms to schools, their

6  faculty and staff, their students, and the surrounding communities. This too is arbitrary.

7      First, the Directive fails to consider the fact that institutions must reconsider plans they

8  spent months drafting with a broad array of experts based on their particular circumstances. As

9  discussed above (*supra* at 7–8), Washington institutions have made "herculean" efforts to not

10  only adapt to an online learning environment, but also to develop instructional policies and plans

11  for fall 2020 that appropriately balance their students' educational needs, the health of the

12  campus and surrounding community, and the appropriate utilization of school resources.

13  Yoshiwara Decl. ¶ 22. WSU, for example, determined after months of evaluation that a hybrid

14  approach for most of the fall, but only-only after Thanksgiving was in the best interest of its

15  students and staff. Chaudhry Decl. ¶ 18. WSU made this decision "to minimize the time [it] must

16  attempt to control COVID-19 spread, minimize travel throughout the state, and to avoid the heart

17  of influenza 'season' to take pressure off campus and community health care resources." *Id.*

18  Under the Directive, however, "all of WSU's F-1 international students will be forced to leave

19  the country after Thanksgiving break, cutting off their ability to finish the semester just weeks

20  from its completion." *Id.* To avoid this scenario—which WSU believes would result in many F-

21  1 students not enrolling in the fall—it would need to have all students return to campus after

22  Thanksgiving, potentially jeopardizing the health and safety of all of its students, faculty and

23  staff, and the local community. The Directive wholly fails to consider the harms caused by

24  requiring schools to potentially overhaul their operational plans in a matter of days or weeks or

25  risk losing their international students. *See id.* ¶ 21; *see also, e.g.*, Kaminski Decl. ¶¶ 4–9

26  (discussing YVC's decision to be online-only and the infeasibility of reassessing its plans within

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

13

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   the Directive's compressed timeframe).

2         <u>Second</u>, the Directive completely ignores the impossible conflict it creates for institutions

3   with international students both inside and outside the United States. Shoreline Community

4   College (SCC), for instance, which had been planning to remain predominately online in the fall,

5   explains that "[i]f the college does not offer hybrid courses, and conducts all classes fully online,

6   413 students who are physically in the U.S. would need to leave the U.S., or transfer to another

7   college or university"; whereas if it "decides to do a hybrid option, that would mean that the

8   299 students physically outside of the U.S. would be out of status and would have to go through

9   an extremely cumbersome process to return to the U.S. in the future to take at least one class in

10   person." Yoshiwara Decl. ¶ 34. The Directive ignores the consequences of this Hobson's choice,

11   which is yet another significant aspect of the problem. *See id.* ¶¶ 34, 36.

12         <u>Third</u>, the Directive fails to consider its devastating effects on international students'

13   safety. For students at hybrid institutions, the Directive ignores (i) the enormous expense and

14   significant health risks of unnecessary international travel for students who must leave or return

15   to the United States as a result of the Directive; (ii) the risk of COVID-19 exposure for students

16   attending in-person classes, particularly for those with underlying health conditions placing them

17   at greater risk; and (iii) the risk of potential detention faced by students who are unable to return

18   to their home country, whether due to COVID-19 travel restrictions or other reasons, in the event

19   of lost visa status if a school resumes online-only learning.

20         For students at online-only institutions, the Directive also ignores that many students who

21   will lose their visas cannot participate in online learning in their home countries due to factors

22   such as lack of internet access, social unrest, war, and time zone differences that make continuing

23   their studies infeasible or impossible. Cauce Decl. ¶ 8 (discussing barriers); Schactler Decl. ¶ 25

24   (describing potentially "perilous situations" for students from Haiti, Liberia, Nepal, Somalia,

25   Sudan, Syria, and Yemen). Over 77% of UW's international students, for instance, come from

26   China, India, Taiwan, and Korea, which have significant time-zone differences, connectivity,

EMERGENCY MOTION FOR               14           ATTORNEY GENERAL OF WASHINGTON
TEMPORARY RESTRAINING ORDER                Complex Litigation Division
NO. 2:20-cv-01070-RSM                          800 5th Avenue, Suite 2000
                                          Seattle, WA 98104-3188
                                           (206) 464-7744

and access issues. Cauce Decl. ¶ 8; Reid Decl. ¶ 4 (discussing unstable and censored internet access in China, including an inability to access Zoom, Google, and journal article sites, as well as a 15-hour time difference); Schactler Decl. ¶ 25. Nor does ICE's Directive acknowledge the impossibility of some students being able to return to their home countries due to travel restrictions, which leaves those students vulnerable to detention. *See, e.g.*, Yoshiwara Decl. ¶ 55 (noting that students from Burundi, Madagascar, and Jordan cannot fly back to their home countries because flights are indefinitely suspended, and students from India or Columbia cannot book flights back to their countries until August 31 at the earliest).

Fourth, the Directive fails to consider the potential impact on the safety of university communities and public health generally. It requires students at institutions offering some in-person classes who are currently abroad to return to U.S. campuses to maintain their visa status. This not only places those students at risk of COVID-19 infection through unnecessary international travel, but also endangers the university and local community more generally, as students will be returning to Washington after extensive travel and exposure to others. In addition, if hybrid institutions begin offering more in-person classes to accommodate visa holders, domestic students who had planned to take those classes remotely would now be required to attend classes in person, creating unexpected and unnecessary housing and/or travel costs and putting those students at increased risk of contracting COVID-19. Reid Decl. ¶ 11.

The Directive gives no indication that ICE even thought about such issues—much less that it addressed them or has a cogent reason for disregarding them. Because ICE "should have considered those matters but did not," its "failure was arbitrary and capricious in violation of the APA." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1914 (2020).

### c.   ICE failed to consider widespread reliance its promise that the March 13 Exemption would last "for the duration" of the pandemic

"When an agency changes course, as DHS did here, it must be cognizant" of "serious reliance interests" that its prior approach has "engendered." *Regents*, 140 S. Ct. at 1913 (internal

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

15

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

quotation marks omitted). "It would be arbitrary and capricious to ignore such matters." *Id.* at 515. Yet that is exactly what the new Directive does, and it is arbitrary and capricious for this independent reason. ICE's about-face forces State institutions of higher education to abruptly reconsider and quickly finalize plans they have worked on for months in reliance on ICE's promise that the March 13 Exemption would be in effect "for the duration of the emergency."

Defendants cannot dispute that "the duration of the emergency" has not ended. Acting in reliance on the agency's guidance that the March Exemption would remain in place as long as "the emergency" continued, Washington institutions proceeded to make their plans for fall 2020. *Supra* at 7. In reaching their decisions, institutions relied on ICE's express statement that, "[g]iven the extraordinary nature of the COVID-19 emergency," international students would be able to study remotely and retain their visas "for the duration of the emergency." *Id.*; Coates Ex. B. Students enrolled at Washington institutions likewise made plans and took concrete actions in reliance on ICE's prior promise—including traveling to or remaining in the United States, booking tickets, leasing property, and foregoing opportunities to attend other institutions. Stewart Decl. ¶ 22. The Directive does not even acknowledge these "serious reliance interests," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016), much less explain why they were (in the agency's view) less important than whatever factors motivated ICE's decision. "Making that difficult decision was the agency's job, but the agency failed to do it." *Regents*, 140 S. Ct. at 1914.

### d.   ICE failed to provide a plausible rationale for the Directive

The Directive is also arbitrary and capricious because ICE failed to articulate *any* rationale to justify its new requirements. It is "a fundamental requirement of administrative law . . . that an agency set forth its reasons for decision; an agency's failure to do so constitutes arbitrary and capricious agency action." *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (internal quotation marks omitted). "[C]onclusory statements will not do; an agency's statement must be one of *reasoning*." *Id.* (internal quotation marks omitted); *see also Dep't of*

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

16

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

*Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (an agency must "articulate[] a satisfactory explanation for its [decision]"). Here, the Directive reflects virtually no reasoned decisionmaking. It identifies a purported "need to resume the carefully balanced protections implemented by federal regulations," but fails to articulate why the agency perceives such a need to exist, or why a resumption of pre-pandemic regulatory regime must begin immediately, while the pandemic continues to rage and the national state of emergency remains in effect.

Instead of its stated reason, ICE's abrupt change of policy appears to have been driven by a political desire to encourage schools to re-open this fall. The same day that ICE issued its new directive, President Trump tweeted "SCHOOLS MUST OPEN IN THE FALL!!!" Coates Ex. D. And the following day, Acting Deputy Secretary of Homeland Security Ken Cuccinelli stated that the purpose of the agency's change in policy was to "encourage schools to reopen." Coates Ex. E. Because "the evidence as a whole" "reveal[s] a significant mismatch between the decision the [agency] made and the rationale [it] provided," the Directive is arbitrary and capricious for this independent reason. *Dep't of Commerce*, 139 S. Ct. at 2575.

**4.    ICE's New Directive Violates the APA's Notice and Comment Requirements**

Under the APA, a court must set aside agency action that is "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). The APA requires agencies engaged in rulemaking to comply with notice and comment procedures. 5 U.S.C. § 553. The agency must publish a notice of proposed rulemaking describing "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). It must then give interested persons at least 30 days to comment on the proposal. 5 U.S.C. § 553(d). "A decision made without adequate notice and comment is arbitrary or an abuse of discretion." *NRDC v. EPA*, 279 F.3d 1180, 1186 (9th Cir. 2002).

A recent case involving attempted changes to F-1 visa requirements, *Guilford College v. McAleenan*, 389 F. Supp. 3d 377, 392 (M.D.N.C. 2019), is instructive. In *Guilford College*, a plaintiff group including multiple colleges and students challenged a Policy Memorandum of the

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

17

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

U.S. Citizenship and Immigration Services that changed a longstanding means of calculating days of unlawful presence for F-1 visa holders, among others. *Id*. at 383–85. The court found that because the Policy Memorandum had a "binding effect" on its administrators, it was a legislative rule subject to the APA's notice-and-comment requirements. *Id*. at 393. Because the agency did not publish the Policy Memorandum in the Federal Register or respond to comments about the change in policy, the court found the plaintiffs likely to succeed on their APA claim, and entered a nationwide injunction enjoining implementation of the policy change. *Id*.

This case is very similar. Here, ICE's Directive, and any "temporary final rule" that follows therefrom, are subject to the APA's notice-and-comment requirements. The Directive is a "rule" within the meaning of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4)—and in fact, ICE intends to publish the Directive's requirements as a "Rule" in the Federal Register. Compl. Ex. 1 at 1. Yet ICE entirely failed to comply with any of the APA's notice-and-comment requirements: the Directive itself was the first and only notice of requirements that must be met by July 15, August 1, and August 4. The Directive identifies no applicable exceptions to the notice-and-comment requirement, and there are none. Absent "good cause" for bypassing notice-and-comment—which ICE has not established, nor could it—the Directive violates 5 U.S.C. § 553. As such, it must be enjoined, vacated, and set aside for that independent reason as well. 5 U.S.C. § 706(2).

## C.    The State Will Be Irreparably Harmed Absent Emergency Relief

Irreparable harm is harm "for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). The harm analysis "focuses on irreparability, irrespective of the magnitude of the injury." *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (internal quotation marks omitted). The testimony of multiple college and university administrators establishes that ICE's Directive is likely to cause irreparable harm to the State of Washington, its educational institutions, students, their families,

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM                    18                    ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

and their communities: it will deprive public institutions of critical revenue that cannot be recovered from Defendants, damage the State economy and local economies, impede schools' educational missions while upending the lives of students and their families, and put public health at risk. These harms are occurring now, and emergency relief is needed before the Directive formally takes effect on Wednesday, July 15. *See Brown v. Kramer*, 49 F. Supp. 359, 363 (M.D. Pa. 1943) (taking judicial notice of national emergency that "render[s] irreparable the injury occasioned by" agency's violation of law).

First, Washington's institutions and the communities in which they are situated rely heavily on international students for their economic viability. Uncompensable economic harm, such as that caused by unlawful federal agency action, satisfies the irreparable harm standard. *See, e.g.*, *Azar*, 911 F.3d at 581; *Idaho v. Coeur d'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015); *Texas v. United States*, 809 F.3d 134, 186 (5th Cir. 2015). As discussed above, the ICE Directive will force many visa holding students to leave Washington State and/or disenroll from Washington institutions that cannot accommodate the in-person attendance requirement to maintain visa status. *Supra* at 6–7. International students contribute nearly $1 billion to Washington's economy annually, including hundreds of millions in tuition and other revenue paid directly to the State's public institutions of higher education. *Supra* at 5.

Public institutions stand to lose multiple millions each in tuition, housing, and other revenue sources. UW, for instance, receives an estimated $185 million in revenue from students on F visa and OPT authorization, which is 26% of the University's net operating fee revenue. Cauce Decl. ¶ 22. The non-resident undergraduate tuition paid by international students ($38,166 per year) "allow[s] the University to offer financial aid resources for other students and keep resident undergraduate tuition within the limits permitted by the Washington State Legislature (currently $11,465)." *Id.* ¶ 23; *see also supra* at 56 (revenue from international students:

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

19

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

$31 million for WSU; $14.6 million for CWU; $107 million for all community colleges).[9]
Washington's colleges and universities have already lost critical revenue from tuition and
housing in fiscal year 2020, as the COVID-19 crisis forced them to close most residential
facilities and move to remote learning. *See, e.g.*, Meotti Decl. ¶ 18; Harrell Decl. ¶¶ 12, 29;
Yoshiwara Decl. ¶ 36. Additionally, losing these students would invariably lead to significant
losses of campus resources, faculty and staff jobs, and in some cases entire academic
departments. *See* Chaudhry Decl. ¶ 25, ¶¶ 28–30 (WSU estimates that seven to twelve graduate
level programs could close as a result of the Directive); Cauce Decl. ¶ 23 (lost revenue from
international students "would require expense reductions to the University's core academic
budget, which would negatively impact the educational experience for both resident and non-
resident students across the University"); *see also, e.g.*, Yoshiwara Decl. ¶ 42; Harrell Decl. ¶
13; Schactler Decl. ¶ 27, 33.

International students also contribute significantly to local economies. A study by the
National Association of Foreign Student Advisors found that international students at UW
contribute approximately $383.3 million to the state economy and support 4,795 jobs in the
state.[10] Cauce Decl. ¶ 33. International students' economic contributions are significant across
the state, and requiring these students to leave would negatively impact local communities. *See,
e.g.*, Pan Decl. ¶ 20 (international students at the Seattle Colleges contributed an estimated $16
million to the local economy in 2019-2020); Yoshiwara Decl. ¶ 49 (SCC estimates that loss of
732 affected students would remove $19,600,730 from the local economy); *id.* ¶¶ 51, 52
(international students at Community Colleges of Spokane and Cascadia College inject over $6.6
million and $2 million, respectively, into local economies); Chaudhry Decl. ¶ 31 (Pullman

---

[9] *See also, e.g.,* Yoshiwara Decl. ¶ 36 (projected loss of up to $9,085,154 for SCC); *id.* ¶ 37 ($5.2 million
for Everett Community College); *id.* ¶ 39 ($2.7 million and $1.9 million for Pierce College and Cascadia College,
respectively); Harrell Decl. ¶ 13 ($1,298,770 for Tacoma Community College); Stewart Decl. ¶¶ 8, 20 (over $20
million for Green River College); Pan Decl. ¶ 5 (Seattle Colleges' revenue generated by international student
enrollment in 2019-2020 was approximately $17.7 million).

[10] *Available at* https://www.nafsa.org/isev/reports/district?year=2018&state=WA&district=07 (last
accessed Jul. 12, 2020).

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

20

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

community would lose $4 million if WSU international students were forced to depart).

Second, the Directive irreparably harms Washington institutions' educational missions, which are furthered by the presence and contributions of international students. Federal action that undermines a state organization or program and impedes its purpose constitutes irreparable harm. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018).

Washington's institutions depend heavily on international students, especially graduate students, to fill critical teaching roles. For instance, in the fall quarter of 2019, more than 1,100 international students held a Teaching Assistant or Research Assistant position at UW. Cauce Decl. ¶ 24. Loss of those students "would result in significant disruption to University teaching and research, both through the loss of valuable expertise and significantly increased costs." *Id.* Similarly, 348 of WSU's teaching assistants are F-1 visa holders; should they leave, WSU would be forced to cancel many classes. Chaudhry Decl. ¶ 29. In addition, WSU might be forced to cancel entire graduate level programs that rely heavily on international students "in areas critical to the mission of the University includ[ing] Physics, Astronomy, Chemistry, Electrical Engineering, Computer Science, Applied Economics, Math, Statistics, and Biology." *Id.* ¶ 28. And UW risks losing F-1 visa holders who "are working on critical COVID-19 work including protein design, research on cardiovascular impacts of COVID-19, contact tracing, and data analysis and forecasting used to understand and control the spread of COVID-19 until a vaccine is developed." Cauce Decl. ¶ 20.

International students also participate in collegiate athletics, and are critical to the survival of those programs. *See id.* ¶ 30. WSU, for instance, has 43 returning and 20 incoming student athletes on F-1 visas. *Id.* "If these students cannot enroll or the Rules force these students to leave the country, five varsity sports teams would not meet NCAA size requirements." *Id.* In addition, international students hold pivotal positions in student government and academic clubs

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

21

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1   and organizations, serve as tutors and mentors to other students, and volunteer in local

2   communities. Stewart Decl. ¶¶ 24–25; Yoshiwara Decl. ¶¶ 58–59.

3          Furthermore, losing international students from the academic community deprives all

4   students of the benefits of exposure to diverse perspectives and opportunities for cross-cultural

5   understanding. *See, e.g.*, Cauce Decl. ¶ 21 ("The entire campus benefits from the diversity that

6   international students bring."); Chaudhry Decl. ¶ 22 ("The absence of international students on

7   the WSU campus would be tremendous detriment; the internationalization goal for the university

8   would be severely compromised . . ."). The reputational loss will also be staggering, as the ICE

9   Directive threatens to tarnish Washington colleges' reputation as safe places and could

10  negatively impact their future recruitment efforts overseas. Yoshiwara Decl. ¶ 45. Reputational

11  damage and revenue loss would likely spell the end of some Washington institutions'

12  international partnerships. *See, e.g.*, Harrell Decl. ¶ 31 (the Directive and budget cuts threaten

13  the survival of Japanese and Danish partnership programs); Chaudhry Decl. ¶ 23 (the Directive

14  may jeopardize international student exchange agreements and WSU's worldwide reputation).

15         Harm to institutions' educational mission of providing a high-quality education to all

16  students is underscored by the enormous financial, emotional, and physical strain on

17  international students and their families. Washington's international students have expressed a

18  multitude of serious concerns, including:

19      • The stress of moving and leaving campus apartments or host families where
20        they have been able to stay safe and continue pursuing their studies during the
          pandemic;

21      • Finding flights out of the United States, which are often prohibitively
22        expensive and in some cases impossible where flights have been indefinitely
          suspended;

23      • The grave fear of risking their health, and that of their families, to take long-
24        haul flights, some of which have multiple stops and may be crowded;

25      • Fear of infecting their loved ones at home, such as elderly parents, or relatives
          who are immunocompromised;

26

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM                                    22                    ATTORNEY GENERAL OF WASHINGTON
                                                                                      Complex Litigation Division
                                                                                       800 5th Avenue, Suite 2000
                                                                                        Seattle, WA 98104-3188
                                                                                           (206) 464-7744

- Fear of becoming ill with COVID-19 in the United States through attendance of in-person classes with no family members nearby to help care for them;

- Disappointment and frustration at potentially not being able to complete their degrees remotely due to time differences and the poor quality or unavailability of Wi-Fi and internet access in their home countries;

- Fear of their visas expiring and new visas not being issued by U.S. Consulates, many of which are currently closed in their home countries;

- Uncertainty of ability to be able to return to the United States if forced to leave; and

- Uncertainty, confusion, and anger brought upon by ICE's betrayal of their trust by abruptly revoking its March 13 Exemption.

*See, e.g.*, Yoshiwara Decl. ¶¶ 46, 55; Kaminski Decl. ¶¶ 13–14, 16, 18; Pan Decl. ¶ 16; Stewart Decl. ¶ 22; Reid Decl. ¶¶ 4–5; Chaudhry Decl. ¶ 19. The extremely short timeframe for compliance increases students' difficulty of making alternative arrangements, such as housing or daycare, in their home countries. Kaminski Decl. ¶ 14. Students who rented apartments in Washington may face penalties for breaking leases. Stewart Decl. ¶ 21; Pan Decl. ¶ 16. Students unable to voluntarily travel home may be forcibly removed or detained by ICE, further risking their health and safety and jeopardizing any future return to the United States. Compl. Ex. 1.

Finally, the ICE Directive threatens the health and safety of Washington's residents. Injury to residents' health and well-being irreparably harms the State itself. *See California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017), *aff'd in pertinent part sub nom. California v. Azar*, 911 F.3d 558 (9th Cir. 2018) (finding irreparable injury based in part on "what is at stake: the health of Plaintiffs' citizens and Plaintiffs' fiscal interests"). As discussed above, the logistics of thousands of international students being forced to travel internationally on a short timeframe with a limited number of flights exacerbates the health risks to them, their families, and the surrounding communities. Conversely, to the extent the Directive succeeds in its goal of coercing schools to reopen, this would necessarily entail putting college and university campuses (and local communities) at increased risk of COVID-19

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

23

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

spread. *See, e.g.*, Harrell Decl. ¶ 25 ("This Rule forces us to offer more in-person classes during a pandemic, and exposes more people to become ill."); Reid Decl. ¶ 11 (if UW began offering courses in-person which are currently scheduled remotely, students who planned to take remote courses would be required to travel to Seattle, secure housing on short notice, and put themselves at increased risk of contracting COVID-19). Classrooms and residence halls have the potential to turn into "super-spreader" situations that endanger the health of not only the college or university community, but also those in the surrounding areas and anyone else with whom community members may come into contact.

**D.      The Remaining Equitable Factors Favor a Temporary Restraining Order**

When the government is a party, the final two *Winter* factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). The balance of the equities and public interest strongly favor injunctive relief here. "There is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (citations and internal quotation marks omitted). As discussed above, the Directive is unlawful for numerous reasons and will wreak havoc on higher education in Washington. Preserving the status quo will not harm Defendants, and refraining from enforcing the Directive will cost them nothing. *See Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (court may waive Rule 65(c) bond requirement).

## IV.      CONCLUSION

For the reasons above, the Court should grant a temporary restraining order.

DATED this 13th day of July, 2020.

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

24

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ROBERT W. FERGUSON
Attorney General

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS, WSBA #53238
KRISTIN BENESKI, WSBA #45478
SPENCER W. COATES, WSBA #49683
Assistant Attorneys General
lauryn.fraas@atg.wa.gov (206) 521-5811
kristin.beneski@atg.wa.gov
spencer.coates@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

25

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

**DECLARATION OF SERVICE**

I hereby declare that on this day I caused the foregoing document to be electronically filed with the Clerk of the Court using the Court's CM/ECF System which will send notification to all counsel of record. Counsel further certifies:

(1) a copy of the TRO Motion, the supporting declarations and exhibits, and the proposed order will be emailed to the Department of Justice promptly upon filing to the following email addresses: Rayford.Farquhar@usdoj.gov and Brian.Moran@usdoj.gov;

(2) a copy of the TRO Motion, the supporting declarations and exhibits, and the proposed order will be served upon Defendants by hand delivery at the following address:

> United States Attorney's Office
> Western District of Washington
> 700 Stewart Street, Suite 5220
> Seattle, WA 98101-1271;

and (3) a copy of the TRO motion, the supporting declarations and exhibits, and the proposed order will be served upon the federal Defendants via FedEx overnight mail, addressed as follows:

> U.S. Department of Homeland Security
> 2707 Martin Luther King Jr. Avenue SE, Mail Stop 0485
> Washington, DC 20528-0485
>
> U.S. Immigration and Customs Enforcement
> Office of the Principal Legal Advisor
> 500 12th Street SW, Mail Stop 5902
> Washington, DC 20536-5902
>
> Chad F. Wolf
> Acting Secretary of Homeland Security
> U.S. Department of Homeland Security
> 2707 Martin Luther King Jr. Avenue SE, Mail Stop 0485
> Washington, DC 20528-0485
>
> Matthew Albence
> Deputy Director
> U.S. Immigration and Customs Enforcement
> 500 12th Street SW
> Washington, DC 20536

EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER
NO. 2:20-cv-01070-RSM

26

ATTORNEY GENERAL OF WASHINGTON
Complex Litigation Division
800 5th Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744

1    DATED this 13th day of July, 2020, at Seattle, Washington.

2

3                                                  */s/ Lauryn K. Fraas*
                                                   LAURYN K. FRAAS, WSBA #53238
4                                                  Assistant Attorney General

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26